(*Circuit Court of Cook County.*)

## People of the State of Illinois ex rel. John Koelling

### vs.

## John C. Cannon, Thomas F. Judge and Abel A. Bach, Constituting the Board of Election Commissioners of the City of Chicago, and Isaac N. Powell, Chief Clerk of said Board.

(March 24, 1908.)

1. ELECTIONS—JURISDICTION OF LAW AND CHANCERY COURTS IN ELECTION MATTERS. If a public officer charged with the administration of an election law refuses to obey its mandate, the party injured is not without remedy, not in a court of chancery, however, but in a court of law.

2. PUBLIC POLICY ACT—JURISDICTION OF CIRCUIT COURT IN MATTERS ARISING THEREUNDER—DECISION OF THE ELECTION BOARD—EFFECT OF SECTION 10 AND 16 OF AUSTRALIAN BALLOT LAW. A decision of the board of election commissioners, that a question is not a proper one to be submitted to the electorate in accordance with the provisions of the public policy act, is not a finality. Section 16 of the Australian ballot act, incorporated into the public policy act by reference merely refers to the manner of printing the ballots and section 10 of the same law gives finality only to the election commissioner's decisions in regard to nomination papers and certificates.

3. MANDAMUS—EXISTENCE OF ANOTHER ADEQUATE REMEDY. The fact that the petitioners may have an adequate remedy by certiorari is no defense to an action of mandamus as in Illinois the existence of another remedy is never a defense to the action of mandamus, if mandamus is proper.

4. PUBLIC POLICY ACT—DUTY OF ELECTION COMMISSIONERS. If the requisite number of petitioners present a "question of public policy" under the public policy act, it is clearly the duty of the election commissioners to put that question on the ballot. If the question is not one of public policy the commissioners have the right to keep it off.

5. SAME—WHAT IS NOT A QUESTION OF PUBLIC POLICY. A question is not one of public policy which embodies a plan of action in violation of law or against the enforcement of the law.

6. SAME—REFUSAL OF ELECTION BOARD TO PUT QUESTION OF PUBLIC POLICY ON BALLOT—REMEDY BY MANDAMUS. Assuming that the board has a certain amount of discretion in determining the

question of whether a proper petition has been presented to them, nevertheless they are guilty, in legal contemplation, of an abuse of that discretion, if in fact they do deny a proper petition, and mandamus will lie in such a case to compel them to submit the question.

7. SAME—THE QUESTION IN THIS CASE. The question: "Shall all places where liquor is sold or given away in this city upon Sunday be closed upon that day?" is a proper one to be submitted to the voters, under the public policy act, as it cannot by any reasonable construction be held to embody a plan of action in violation of law as contended.

Petition for *mandamus.* Heard before Judge Charles M. Walker. The facts are stated by the court.

*Levy Mayer* and *Harry Rubens,* for petitioner.

*Walter L. Fisher* and *Frank D. Ayers,* for respondents.

### STATEMENT.

This is a petition in the name of the people of the state of Illinois on the relation of John Koelling, for a writ of *mandamus* against John C. Cannon, Thomas F. Judge and Abel A. Bach, constituting the Board of Election Commissioners of the city of Chicago in said county, and Isaac N. Powell, the clerk of said board, respondents, praying that a writ of *mandamus* issue, directed to them, commanding them to place before the voters of said city of Chicago in the manner provided by law, upon a separate ballot at the ensuing city election to be held in said city of Chicago on Tuesday, April 7, 1908, the following question:

"Shall all places where liquor is sold or given away in this city upon Sunday be closed upon that day?"

The petition sets forth that February 7, 1908, the said relator delivered to said respondents and filed with them and on said date received their receipt therefor, a petition in words and figures as follows:

"Chicago, Ills., January 31, 1908.

To the Board of Election Commissioners of the City of Chicago.

Gentlemen:—We, the undersigned, legal and registered

voters of and residing in the city of Chicago, Cook county, Ill., hereby specifically petition you to place before the voters of said city in manner provided by law upon separate ballot at the ensuing city election to be held Tuesday, April 7, 1908, the following question:

"Shall all places where liquor is sold or given away in this city upon Sunday be closed upon that day?"

That said petition was at the time of its filing, as aforesaid, and still is signed by 174,146 legal and registered voters of and residing in said city of Chicago, constituting more than 48 per cent of the total registered voters of said city; that the relator was upon said date and still is a legal and registered voter of said city and that he signed said petition before it was filed and that his signature is still attached thereto. That March 11, 1908, said Cannon, Judge and Bach, being the board of election commissioners as aforesaid, by a vote of two to one, said Cannon and Bach voting in the affirmative, and said Judge in the negative, entered of record an order refusing said petition and declining and refusing to place before the voters of said city in manner provided by law upon a separate ballot at said ensuing election the question contained in said petition: "Shall all places where liquor is sold or given away in this city upon Sunday be closed upon that day?" and still refuse to place said question before the voters of said city at said election to be held as aforesaid.

That said action and conduct of said board of election commissioners is a violation of law and contrary to their legal duty and oath of office and by means thereof the said registered voters who have signed said petition, including the relator, are prevented from having submitted to and placed before the voters of said city in manner provided by law the said question at said election to be held as aforesaid which question said registered voters, including the relator, are justly and lawfully entitled to have submitted to the voters of said city in the manner and at the time as set forth in said petition, and which question calls for the consideration

of an opinion on a question of public policy at a general election in the manner and form as prescribed by the statutes of the state of Illinois. The respondents have demurred to said petition and the cause came on to be heard upon their demurrer.

OPINION.

WALKER, J.:—

In support of the demurrer, the respondents first took the broad ground that the election commissioners, in matters of this kind, were subject to no judicial authority whatever, either in law or chancery, citing several cases supporting their contention so far as the jurisdiction of a court of chancery is concerned. There is no question that chancery being concerned only with property and civil rights lacks jurisdiction in matters involving rights purely political. But in a recent case, reaffirming this principle, the supreme court of this state said:

"If a public officer charged with political administration has disobeyed or threatened to disobey the mandate of the law, whether in respect to calling or conducting an election, or otherwise, the party injured or threatened with injury in his political rights is not without remedy. But his remedy is in a court of law, and not in a court of chancery." *People v. Barrett,* 203 Ill. 99, 105, quoting *Fletcher v. Tuttle,* 151 Ill. 41.

*Mandamus* is a law action, and this court sits as a court of law in hearing it. Therefore, if petitioners have a remedy in this proceeding, it is properly here.

Counsel, however, contend that by the statute known as the Australian Ballot Law, passed in 1891 (Laws 1891, p. 107), the remedy at law is ousted and final jurisdiction over the question involved in this case vested in the election commissioners, by virtue of sections 10 and 16 of said statute;"

Section 6 of the statute relates to "nomination papers;"

Section 7 to "certificates to be filed;"

Section 10, so far as it is said to apply here, is as follows:

"Sec. 10. The certificates of nomination and nomination

papers being so filed and being in apparent conformity with the provisions of this act, shall be deemed to be valid unless objection thereto is duly made in writing. Such objections or other questions arising in relation thereto in the case of nomination of state officers shall be considered by the secretary of state and the auditor and attorney general and the decision of the majority of these officers shall be final. * * * In any case where such objection is made, notice shall forthwith be given to the candidates affected thereby addressed to their places of residence as given in the nomination papers and stating the time and place when and where such objections will be considered; provided, that in cities, towns, or villages having a board of election commissioners such questions shall be considered by such board and its decision shall be final.''

Section 16, also passed in 1891 (as amended in 1899), is as follows:

''Sec. 16. Whenever a constitutional amendment or other public measure is proposed to be voted upon by the people, the substance of such amendment or other public measure shall be clearly indicated on a separate ballot, and two spaces shall be left upon the right hand margin thereof, one for the votes favoring the amendment or public measure, to be designated by the word 'Yes,' and one for votes opposing the amendment or measure, to be designated by the word 'No,' as in the form herein given.'' (Giving form.)

''The elector shall designate his vote by a cross mark, thus (X). The said separate ballot shall be printed on paper of sufficient size so that when folded once it shall be large enough to contain the following words, which shall be printed on the back: 'Ballot for Constitutional Amendment,' or the name of any and all public measures then to be voted on. This ballot shall be handed to the elector at the same time as the ballot containing the names of the candidates, and returned therewith by the elector to the proper officer in the manner described by this act. All provisions of this act relating to ballots shall apply to this separate ballot.''

The act providing for the submission of questions of public policy to the electors was passed in 1901 (Laws of 1901, p. 198), and is as follows:

"No. 1. Be It Enacted, etc., That on a written petition signed by twenty-five per cent of the registered voters of any incorporated town, village, city, township, county or school district; or ten per cent of the registered voters of the state, it shall be the duty of the proper election officers in each case to submit any question of public policy so petitioned for, to the electors of the incorporated town, village, city, township, county, school district or state, as the case may be, at any general or special election named in the petition; provided, such petition is filed with the proper election officers in each case not less than sixty (60) days before the date of the election at which the question or questions petitioned for are to be submitted."

Not more than three propositions shall be submitted at the same election, and such proposition shall be submitted in the order of its filing.

"No. 2. Every question submitted to electors shall be printed in plain, prominent type, upon a separate ballot in form required by law, the same as a constitutional amendment or other public measure proposed to be voted upon by the people."

Counsel for respondents contend that there is no remedy at law to interfere with their decision as to what is or is not a question of public policy, and hence, whether a proposed question sufficiently signed for and filed, as required by law, should or should not be put upon the ballot; that the finality given their decisions by section 10 aforesaid in relation to "Certificates of Nomination," "Nomination Papers" and "Objections" thereto must be held to apply to and govern the Public Policy Act by virtue of section 2 of that act, and by necessary implication of law as fully as if expressly provided therein. "Necessary implication by law" means so strong a probability of an intention that a contrary intention cannot be supposed. Section 2 provides for nothing more than the printing and form of the ballot the same as a

constitutional amendment required by section 16. Section 16, after providing for the form of the ballot, says, "All provisions of this act relating to ballots shall apply to this separate ballot." Therefore, and therefrom, a "necessary implication of law," is sought to be deduced that section 10 relating to nomination certificates, nomination papers and objections thereto, and making the commissioners' decision final thereon, applies to the public policy act and makes their decision final as to whether a question, as a question of public policy, is proper to be put upon the ballot or not.

It may be noted that section 6 and 7 refer to "nomination papers" and "certificates of nomination," and that section 10 following is limited in terms to them and particularizes them and the "objections" to them and nothing more as the questions upon which the decision of the board shall be final. I am unable to perceive how or why it can give the board the final decision as to what is or is not a constitutional amendment, or what is or is not a question of public policy, simply because the law relating to these matters contains provisions prescribing the form and printing of the ballots and make the other provisions of the law "relating to ballots" merely, apply. Section 10 has nothing to do with ballots. It seems plain that it is a special provision covering the special objects named and cannot come under the principle that "whenever the provision of a statute is general, everything which is necessary to make such provision effectual is supplied by the common law and implication." There are other provisions which in my opinion cannot permit the public policy act to be reconciled as subject to the terms of section 10, among them the giving of notice required upon objection filed. Under section 10, when objection is made, the board is required to give notice to the parties affected, addressed to their places of residence as stated, notifying them of the time and place of hearing.

Hence one objection might require the absurdity of sending notices as in this case to 174,000 petitioners, for they are the parties and the only parties here affected.

While these reasons seem to me sufficient answer to meet

the contention of counsel that the election commissioners have the final decision whether a question properly is a question of public policy or not and whether they will submit it to the people or not. In my opinion a better and the true answer is this: That the legislature, for good reason, hereinafter stated deliberately, meant that they should not have such power, and therefore intentionally withheld it.

The doctrine of implications does not go to the extent of supplying things which were intentionally omitted by the legislature.

In view of the multitude of political offices to be filled and the frequent attendant strife, there may be sound policy, good reason and common sense in having final decisions upon contested nominations by a board of election commissioners at the earliest possible moment, but there can be no good reason, policy or sense in committing to such a board absolutely final decision upon a question directly affecting one of the fundamental principles of government, the constitutional right of the people "to make known their opinions to their representatives." Const. sec. 17, art. II. Bill of Rights, and the Public Policy Act, is a formalized and enacted method of making the people's opinions known.

Such absolute and unconditional finality of decision vested in such a board, so far as the point in question is concerned, would place the board above the supreme court of the state, make the commissioners final interpreters and arbiters of the constitution itself, and render it possible for an unscrupulous board to permit only such question of constitutional amendment—public policy and public measures—to be submitted to the people as it might approve, or, indeed, to withhold them from the people altogether and throttle their voice at will.

That is why I say that the legislature surely never intended that such should be the law. A contrary holding is too preposterous to be suggested, much less to be endured.

Respondents contend that if there is a remedy the proper one is by way of "certiorari." This is not a proceeding for a writ of certiorari, nor is the court concerned whether cer-

tiorari would or would not be a better remedy. The statute provides:

"The proceedings for a writ of *mandamus* shall not be dismissed nor the writ denied because the petitioner may have another specific legal remedy, where such writ will afford a proper and sufficient remedy." 2 Starr & Curtis, Rev. Stat. ch. 87, sec. 9.

The question then is: Does *mandamus* lie? It does, if the petitioners show that they have a clear legal right to have the thing done which they ask to be done and that it is the clear legal duty of the respondents to do it.

In other words, if the petitioners presented to the board of election commissioners a "question of public policy" under the public policy act, as alleged in the petition it is clearly the duty of the board to put that question upon the ballot. If not, the board did right in refusing the petition.

The form of the question petitioned to be submitted is: "Shall all places where liquor is sold or given away in this city upon Sunday be closed upon that day?"

The majority commissioners correctly say, in their decision attached to the petition as an exhibit, that the intent of the public policy statute "is to procure an expression of public sentiment upon some policy of government for the purpose of bringing about through the proper channel, either the enactment of a new law or the repeal, modification or amendment of one already upon the statute books;" they further say: "That there is now in full force and effect in this state a statute prohibiting all such places remaining open Sundays;" that a negative vote on the question "would mean that the voters had declared that the saloons should remain open *regardless of the law;*" that the question proposed "is *not* whether the law should be *repealed;* it is not whether the law should permit saloons to remain open on Sundays; but it *is* whether a law, now in force shall or shall not be obeyed."

I again agree with the commissioners when they hold as they do that "a question cannot be one of public policy which embodies a plan of action in violation of law;" or

"against the enforcement of the law." They also hold that the proposed question does so embody such plan of action and deny the petition for that reason.

On the other hand, the petitioners contend that the question clearly is one of public policy as above defined by the commissioners themselves, and can by no reasonable construction, in all the circumstances, be construed to be anything else; and, therefore, it is entitled to be put upon the ballot. Upon the correct determination of this issue, depends the petitioners' right to the writ.

The petitioners in argument contend that in construing their motives, as the commissioners did, they took no consideration of many well known local conditions; the fight for the constitutional amendment providing for a charter to give Chicago home rule, the new charter itself and its passage by the legislature giving Chicago home rule in all matters of domestic concern, but one, expressly withholding it from the city so far as the question of Sunday opening or closing was concerned; and the overwhelming defeat of the charter due in most part, it is claimed, to that fact. The petitioners urge their right to an expression of the sentiment of the community as to whether this city is in favor of an open Sunday or a closed one for the purpose of indicating their desire to their representatives in the next legislature, so that they may have the benefit of such expression at its next session, and give the people home rule on this question if they express a desire to have it; that petitioners' agitation for and intention to seek such legislature were and are matters of common knowledge in the community and well known to said commissioners; that all these considerations deliberately have been ignored by said commissioners who have gone out of their way to put a forced, wrong, and in the circumstances, wholly unreasonable construction upon the proposed question, neither in any way expressed therein nor reasonably to be inferred therefrom and upon that construction have declared the question to be not a question of public policy at all.

It is conceded that if the question presented was not a question of public policy the petition was properly refused.

If it did present a question of public policy, the board had no right to deny it.

Assuming, as contended, that the board had a certain amount of discretion in determining the question, nevertheless if in doing so it has refused a petition which does present a question of public policy, it is in contemplation of law guilty of an abuse of that discretion. That *mandamus* will lie in such case is not denied and needs no citation of authorities.

The construction put by the board upon the proposed question is hereinbefore stated.

It must be and indeed is admitted that the question in itself and standing alone without reference to the existing statute is properly a question of public policy.

Respondents' counsel say that probably it would have been ordered on the ballot but for the contentions of the objectors who appeared against it and whose objections were considered.

The law does not contain any provisions for the filing or hearing of objections to proposed questions of this kind, public measures or constitutional amendments. However, in a proper case, I see no reason why objectors may not appear before the board as *amici curiae,* so to speak, and make known their objections to aid it in keeping free from error; and it is within the power of the board to frame reasonable rules to that end.

In view of all the surrounding circumstances, the conclusion seems irresistible that the board has construed and treated this question as a purely academic proposition; without giving the 174,146 petitioners due benefit of presumptions that exist in their favor, among them the presumption of "good intent as against bad intent;" the presumption "against absurdity," which merely means the presumption in favor of ordinary common sense; the presumption "against doing a vain or useless thing," which in this case would be

planning action for the nonenforcement of a law, which, as everybody knows, is not enforced now; and also without looking at the question in the light of contemporary local history and conditions above referred to, unless as against all this it still can be said that the question embodies a "plan of action in violation of law."

If it can be pointed out that a negative vote upon the question would embody or result in any "plan of action" in violation of law or against its enforcement which could not be fully as well undertaken or could not be quite as lawfully and effectively met and dealt with by the law and the civil authorities after such vote as before, the objection might be held to be good and well taken.

Let us assume that the vote has been taken, that it is negative, that is, against closing all places where liquor is sold or given away on Sunday. What is the result? So far as the law or the enforcement of the law is concerned, how is the situation changed in the slightest degree? What "plan of action" is the community left to encounter? The law remains precisely the same; precisely the same officers of the law remain under precisely the same oaths and obligations and with the same powers to enforce it and under precisely the same penalties as before for not enforcing it.

When this question was asked at the hearing, counsel for respondents frankly admitted that in respect of the things mentioned there would be no change, the situation would remain the same.

What then is the net result of the vote but a mere expresssion of opinion upon the question of the public policy as to Sunday opening or Sunday closing?

Respondents' only answer is that such vote might be misconstrued by the lawless and leave room for argument on their part that it meant a declaration in favor of non-enforcement of the law.

The reason,—the mere possibility of an aftermath argument, even if sound—is not of sufficient force to disfranchise the people and deprive them of their constitutional and legal

right to an expression of their opinion. The reason however, is not only not sound, but is destructive of itself; because a complete answer to the argument suggested would be the decision of a court of competent jurisdiction to the contrary; this court now holding as it does that the question does not embody and cannot by any reasonable construction be held to embody any plan of action in violation of law or declaration for its non-enforcement.

For the reasons stated, the court further holds that the question proposed clearly is a question of public policy, not academic merely, but of vital interest to the whole community, that the petitioners have a clear legal right to have it put upon the ballot and that it is the clear legal duty of the board of election commissioners to put it there.

Therefore, the order of the court will be that the demurrer is overruled and that the writ of *mandamus* issue, as prayed.